**Dominick J. AQUILIO, Plaintiff,**

v.

**POLICE BENEVOLENT ASSOCIATION OF The NEW YORK STATE TROOPERS, INC., John R. Canfield and Richard Fairchild, Defendants.**

No. 91–CV–325.

United States District Court, N.D. New York.

June 15, 1994.

Donald J. Aquilio, Marietta, GA, for plaintiff.

Hinman Straub Pigors & Manning (William F. Sheehan, John R. Saccocio, of counsel), Albany, NY, for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

Currently before the court is a motion for summary judgment by the defendant, the Police Benevolent Association of the New York State Troopers, Inc. ("PBA").[1] Also before the court is the motion for partial summary judgment by the plaintiff, Dominick Aquilio, a retired New York State Trooper, who brings this action in connection with the PBA's administration of its group life insurance program.[2] Jurisdiction is predicat-

---

[1]. Originally the plaintiff had also named as defendants John R. Canfield and Richard Fairchild, the President and Treasurer, respectively, of the PBA. According to the PBA, by stipulation, the action has been dismissed as against those two defendants. Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendant's Memorandum") at 1, n. 1. No such stipulation appears in the court's file, however, and there is no indication of the same on the docket sheet. If the stipulation has been executed but not filed, counsel are directed to do so immediately. If the stipulation has not been executed yet, then obviously that must be done and it should be promptly filed with the court. For now though, based upon the PBA's representation, as well as plaintiff's reference to John Canfield as a "former defendant," Affidavit of Dominick J. Aquilio (Mar. 31, 1992) at ¶ 11, and because no legal arguments are made with respect to the two individual defendants in any of the motion papers, the court assumes that the PBA is the only remaining defendant. (The court

notes that plaintiff's affidavit is misnumbered; it does not contain a paragraph four. Rather than renumbering the paragraphs, the court has left the affidavit in its original, uncorrected form.)

[2]. There is a discrepancy between plaintiff's Notice of Cross Motion and his supporting affidavit as to the relief he is seeking herein. In his Notice of Cross Motion, in the section denoted "Relief asked," plaintiff specifically seeks "Summary Judgment on Count Two of the Complaint and award of attorney's fees and expenses under 29 U.S.C. § 1132(g)." In his supporting affidavit, however, plaintiff seeks an "award [of] all the relief ... requested in my Complaint with respect to the bargain I made with the PBA...." Aquilio Affidavit at ¶ 15 (emphasis added). He likewise declares that this affidavit is submitted "in support of a motion for partial **or complete summary judgment** ...." *Id.* at ¶ 1 (emphasis added). Thus it appears on the face of it that through his supporting affidavit, plaintiff is seek-

ed upon the existence of a federal question under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[3]

## BACKGROUND

By way of background, the PBA is an employee organization representing active and retired members of the New York State Police. Affidavit of John R. Canfield (Mar. 30, 1992) at ¶ 5. As an employee organization, the PBA undertakes a wide variety of responsibilities on behalf of its members, including the procurement of group term life insurance, which it has offered to its membership since at least 1961. Affidavit of Richard D. Fairchild (Mar. 25, 1992) at ¶ 27; *see also* Canfield Affidavit at ¶¶ 17 and 18. Participation in the PBA's insurance plan is strictly voluntary. Canfield Affidavit at ¶ 25; *see also* Affidavit of Caryl Erhardt (Mar. 27, 1992) at ¶ 8. One advantage to plan participation is the fact that PBA members are able to purchase insurance at group rates, without the common requirement of a physical examination. Canfield Affidavit at ¶ 24.

Throughout the years, the PBA, through a competitive bidding process, has contracted with licensed life insurance companies to underwrite and provide this group term life insurance to its members. *Id.* at ¶ 20; Fairchild Affidavit at ¶¶ 20, 21, and 23. This term life insurance is provided at fixed rates for a specific duration, usually one to three years. Canfield Affidavit at ¶ 23. Many different companies have provided this insurance over the years;[4] and consequently, with each contract, there have been variations in the amount of insurance available, the cost, and the amount that can be "carried over" into retirement. Common to all of these insurance contracts and plan summaries, however, including the US Life policy, is that they set forth the circumstances which could result in disqualification, ineligibility, denial or loss of benefits.

When the PBA changes life insurance carriers, its practice is to notify member plan participants in writing of the details of the new insurance programs, including any rate changes. *Id.* at ¶ 28. Plan participants also receive written notification of the specifics pertaining to the new insurance programs, in the form of plan summaries.[5] *Id.* at ¶ 29. These plan summaries give an indepth description of the terms and conditions of the current policy. Erhardt Affidavit at ¶ 22. In addition, as required under ERISA,[6] the PBA annually files with the United States

---

ing relief premised upon his first and second cause of actions, rather than just with respect to his second cause of action, as indicated on his Notice of Cross Motion. In any event, the court will presume that plaintiff intends to seek only the relief delineated in his Notice of Cross Motion; that is summary judgment as to his second cause of action only. Therefore, the court deems plaintiff's cross-motion to be one for partial summary judgment as allowed by Fed.R.Civ.P. 56(a).

3. In its answer, the PBA raises, *inter alia*, a defense of lack of subject matter jurisdiction. Answer at ¶ 8. By stipulation between the parties, the PBA has agreed to dismissal with prejudice of that defense. Affidavit of Donald J. Aquilio (April 9, 1992), exh. 1 thereto. However, because subject matter cannot be waived, consented or stipulated to by the parties, *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 377, n. 21, 98 S.Ct. 2396, 2404 n. 21, 57 L.Ed.2d 274 (1978); *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556, 42 L.Ed.2d 532 (1975), the court has an independent obligation, regardless of the stipulation, to ascertain whether it does, in fact, have subject matter jurisdiction over this action.

Fortunately, the issue of whether the court has subject matter jurisdiction to entertain this case can be quickly resolved. As will be seen, given the fact that the plan at issue is plainly governed by ERISA, *see supra* at 22–25, there can be no doubt that this action lies with the jurisdiction of this federal district court.

4. Since 1980 alone, the PBA has contracted with six different insurance companies.

5. As this court has previously explained, "A 'Plan Summary' [or Summary Plan Description ("SPD")] is a booklet that must be distributed to all fund participants, describing relevant provisions of the Plan. *See generally* 29 U.S.C. § 1022; 29 C.F.R. § 2520.102 (1991). The purpose of the Summary is to apprise the participants of their rights and obligations under the Plan in a manner which the average plan participant could comprehend. *See* 29 U.S.C. § 1022(a)(1); 29 C.F.R. § 2520.1102(a)." *Osborne v. N.Y. State Teamsters Fund*, 783 F.Supp. 739, 742 n. 2 (N.D.N.Y.) (C.J., McCurn), *vacated on other grounds*, 792 F.Supp. 177 (N.D.N.Y. 1992).

6. *See* 29 U.S.C. § 1023 (West 1985).

Department of Labor a reporting and disclosure form regarding the group life insurance program which it is offering at the time. Fairchild Affidavit at ¶ 41. The insurance companies with whom the PBA has contracted must make the same filing. *Id.* at ¶ 44.

Insofar as plaintiff Aquilio is concerned, he was born March 8, 1925 and became a New York State Trooper in 1959. Defendant's exh. O (Deposition of Dominick Aquilio (Sept. 17, 1991) at 7 and 12). Soon after becoming a trooper, Mr. Aquilio joined the PBA and became aware of the availability of life insurance through that organization. *Id.* at 13–14. Early on in his career, the plaintiff voluntarily elected to purchase life insurance coverage beyond the minimal coverage he received by virtue of his status as a PBA member, and he has maintained coverage continuously up to the present time. *Id.* at 13–15.

The US Life policy which is the subject of this litigation was in effect from June 1, 1985 through November 30, 1988. There are three separate documents beyond the policy itself and the plan summary upon which plaintiff relies to support his first cause of action. Thus a somewhat detailed review of those documents is necessary to an understanding of the parties' respective arguments as to the viability of that cause of action. The first document is a letter from PBA Treasurer Fairchild which plaintiff acknowledges receiving in the first part of 1985.[7] Aquilio Affidavit at ¶ 7. Fairchild explains that he wrote that letter to announce the "new" PBA insurance program to be offered through US Life, which had "certain changes from previous PBA group life insurance plans." Fairchild Affidavit at ¶ 51. That letter closed by stating, "[a]ny questions, you may have, please call the PBA office." Complaint, exh. A thereto at 2. According to Treasurer Fairchild, in the case of plaintiff Aquilio, those were not just empty words, because Fairchild was plaintiff's PBA delegate, as well as his personal friend. Fairchild Affidavit at ¶ 54. Even given that relationship, Fairchild claims that he does not

recall receiving any questions from plaintiff around the time this letter was sent. *Id.*

Included with this 1985 letter was a chart comparing the "new" PBA insurance program offered through US Life with the PBA program then currently in place. Complaint, exh. A thereto. The attached "Comparison Chart" mentioned several times that the coverage would be "maintained until death." *Id.* Also included with that letter was a document entitled "Reduction Formula;" and it too made reference to coverage "till death." *Id.* In one brief synopsis, for example, it stated:

125,000 policy

You can take 125,000 into retirement which reduces to 43,750 at age 60, reduces to 37,500 at age 65. *This coverage remains till death.*

*Id.* (emphasis in original). A similar provision was included for additional coverage offered through the "new PBA Tier Two" plan. *Id.* The "Reduction Formula" also summarized the coverage if a retired member took advantage of both the Tier One and Tier Two plans as follows: "You could take 250,00 [sic] into retirement which would reduce to 87,500 at age 60, reduced to 75,000 at age 65, which would **remain until death**[.]" *Id.* (emphasis added). Plaintiff Aquilio avers that "[b]ased on this information, I believed that by enrolling in both Tier One and Tier Two PBA coverage, I would have life insurance at the death benefit levels set forth in the communication until my death at the specified premium levels." Aquilio Affidavit at ¶ 8. Mr. Aquilio therefore enrolled in the "new" PBA program and opted to take the dependent coverage described in that communication for his wife. *Id.*

After the PBA contracted with US Life to underwrite the group term life insurance policy, as was its usual practice, the PBA asked US Life to prepare for distribution to all plan participants a plan summary, detailing the terms and conditions of the US Life policy. Fairchild Affidavit at ¶ 55. US Life did not

---

**7.** The letter itself contains no date. *See* Complaint, exh. A thereto. The court will simply refer to this document as the 1985 letter.

provide a draft summary, however, until mid–1986. *Id.* at ¶ 56. Finally, in approximately March, 1987, the US Life generated plan summary received the required approval from the New York State Insurance Department. *Id.* at ¶ 59. The plan summary was then mailed "to all participants." *Id.* As had previous plan summaries provided in conjunction with PBA sponsored insurance programs,[8] the US Life plan summary detailed the terms and conditions of the PBA's contract with US Life, including an explicit cancellation provision. Canfield Affidavit, exh. A thereto.

Plaintiff Aquilio claims, however, that he never received this particular US Life plan summary. Complaint at ¶ 18. Interestingly, apparently he is the only plan participant who claims not to have received this document. Canfield Affidavit at ¶ 61; *see also* Erhardt Affidavit at ¶ 27. In fact, after receiving this US Life plan summary, many PBA members contacted the PBA with questions about it. *Id.; see also* Erhardt Affidavit at ¶ 26.

The second document upon which plaintiff relies to support his first cause of action is another PBA generated communication. This communication addressed various insurance coverage options, including the impact of the same in terms of retirement. In so doing, that letter expressly referred to "present available coverage" and "your current biweekly deduction." *Id.* Complaint, exh. B, thereto. Enclosed with that May, 1987 letter was an enrollment card and a payroll deduction card, which Mr. Aquilio filled out and returned to the PBA. Plaintiff's next communication regarding the PBA's new insurance program with US Life was a letter dated October 29, 1987 from PBA President Canfield. Complaint, exh. C thereto. Acknowledging receipt of plaintiff's notice of retirement, that letter expressly advised, among other things, "At age 60, your coverage will reduce to $87,400 at a cost of $367.50 annually plus your dues and dependent coverage premium. At your final reduction ($75,000) you will pay an annual premium of $315.00 plus dues and dependent coverage." *Id.*

Effective September 3, 1987, plaintiff retired. *Id.* When making his retirement plans in the preceding spring, plaintiff Aquilio elected an irrevocable single life retirement annuity. Aquilio Affidavit at ¶ 10, and exh. D thereto. More particularly, on the election form, Mr. Aquilio checked the box designated "Single Life Allowance," which states, "I elect to receive the maximum lifetime retirement allowance payable to me. Stop all payment at my death. **DO NOT NAME A BENEFICIARY.**" *Id.,* exh. D thereto (emphasis in original). Mr. Aquilio explains that he understood that under this option, if he predeceased his wife, she would receive no benefits. Aquilio Affidavit at ¶ 10. He further avers that he "[a]lso understood that the PBA $75,000 death benefit was maintained "until death" at premiums the PBA set forth in the above-noted communications. I later learned that such was not at all the truth as to the PBA insurance." *Id.* Indeed, Mr. Aquilio further maintains that it was not until the deposition of office manager Erhardt, conducted as part of this litigation, that he became aware that his US Life insurance policy does not continue until his death, but terminates at age 85. *Id.* at ¶ 14.

After the US Life contract, the PBA entered into a contract with another insurance company—American International Life Insurance Company ("AI Life")—to provide similar coverage to its members. That contract was to provide group term life insurance for a three-year period commencing December 1, 1988 through November 30, 1991. Fairchild Affidavit at ¶ 69. Under the terms of the AI Life contract with the PBA, term life insurance rates for retired members, such as Mr. Aquilio, were increased somewhat, and affected retirees were so advised in writing. Fairchild Affidavit at ¶¶ 74 and 76, exhs. K and L thereto.

While the AI Life contract was in effect, AI Life advised the PBA that it intended to terminate that contract because supposedly the percentage of PBA membership participation had fallen below that required there-

---

8. PBA Treasurer Fairchild avers that plan participants, such as plaintiff Aquilio, were "regularly informed that their insurance was cancelable." *Id.* at ¶ 27.

under. *Id.* at ¶ 78. The PBA disagreed with AI Life's interpretation of the relevant contractual provision, but nevertheless decided to change to another insurance company so as not to risk termination of coverage under the AI Life contract without a new plan being in effect. *Id.* at ¶ 79.

The PBA then decided to solicit bids for a new insurance company to provide coverage to its members. Procurement of a replacement insurance carrier was not easy. In fact, according to the Senior Vice President of the PBA's appointed broker, "only one insurance carrier was willing to underwrite term life insurance for the PBA out of the nine (9) major carriers which Jardine [the broker] solicited." Affidavit of Willis H. Griffith (Mar. 23, 1992) at ¶ 9. Common to all of the submitted proposals was the carriers' insistence upon an age based rate structure. *Id.* at ¶ 80. Somewhat surprisingly, age had not been a factor in PBA's prior insurance offerings. After much consideration, the PBA established a new rate structure that went into effect on October 1, 1990 with a new carrier—Preferred Life of New York ("Preferred Life"). *Id.* Because rates under Preferred Life's program are directly linked to age, the rates of many of PBA's retired members increased substantially. *Id.* at ¶ 81. The PBA's stated justification for agreeing to that increase was that many younger members pay substantially lower premiums, thus encouraging greater overall participation in the plan, which in turn ensures the plan's long-term viability and allows the PBA to continue to provide, at competitive rates, low-cost life insurance. *Id.* at ¶ 81. "[A] number of letters were sent to the PBA membership and plan participants notifying them of the impending changes[ ]" brought about as a result in the switch to Preferred Life. *Id.* at ¶ 84, and exh. M thereto (copies of those letters).

After receiving notification of this rate increase in October, 1990, when he received a reduced pension check,[9] plaintiff commenced this lawsuit. Before doing so, however, upon receipt of this reduced pension check, plaintiff claims to have immediately contacted the PBA, which allegedly advised him that the US Life policy was cancelled or terminated late in 1989. Complaint at ¶ 13. Plaintiff further alleges that at that time the PBA told him that the for the six months following cancellation of the US Life policy, the PBA had contracted with another insurance company, but that policy too was supposedly cancelled. *Id.* Under plaintiff's version of events, the PBA purportedly sent him letters to this effect, which went unanswered. Lastly, the plaintiff asserts that the PBA informed him that after cancellation of the US Life policy, it obtained a $75,000 death benefit policy at a premium rate higher than that under the US Life policy. *Id.*

At the heart of this lawsuit is plaintiff's belief that when he elected to receive additional group life insurance coverage through the PBA in July, 1987, just several months prior to his retirement, such coverage entitled him to receive life insurance coverage of $75,000 at a cost of $315 annually for the remainder of his life. As it turns out, however, at least according to the PBA, that was not the case. It is the PBA's position that it never agreed to provide life insurance at fixed rates for any of its plan participants, including the plaintiff. Indeed, the PBA's President, John Canfield, the Board Member responsible for many insurance-related issues, avers that during his tenure (since 1980), "all of the term life insurance contracts the PBA has entered into with life insurance companies . . . have been limited in duration, with rates that we could only maintain for a maximum of three (3) years." Canfield Affidavit at ¶¶ 4, 21, and 27. He further avers, "[n]o term life insurance program that ever came to my attention offered fixed rates on a long-term basis, or for the life of the insured individual." *Id.* at ¶ 26. According to Canfield, "[t]he PBA's term life insurance program was never designed to be unlimited in duration at a fixed rate." *Id.*

---

9. Plaintiff explains that when he received his monthly pension check around November, 1990 instead of a monthly premium payment of $26.00 for the US Life coverage, it indicated a payment of $251.00. Aquilio Affidavit at ¶ 13. Since then, that premium payment has remained the same, and plaintiff, on advice of counsel, has continued to make these payments under protest. *Id.*

In fact, PBA Treasurer Fairchild goes so far as to aver that "[t]he PBA has never provided its membership any cash value, dividends, loans or other mechanisms which might suggest that a participant was receiving anything other than term life insurance." Fairchild Affidavit at ¶ 22.

Along these same lines, it is interesting to note, although certainly not determinative, that Willis H. Griffith, the Senior Vice President of the PBA's appointed brokerage company, opines "that the New York State Insurance department does not permit lifetime coverage under group term life insurance policies." Griffith Affidavit at ¶ 17. To allow such coverage would, in Mr. Griffith's opinion mean "that the plan's loss experience would deteriorate to the point that the insuring company would terminate the plan." *Id.* Finally, he opines, quite emphatically, that "[i]n my entire experience, I have never seen a term life insurance policy that offers a guaranteed fixed premium rate with a level death benefit for the life of the insured, and, in my opinion, none exist." *Id.* at ¶ 19.

Plaintiff's complaint is divided into two "counts." The first is designated as an "estoppel" claim, wherein plaintiff contends, based upon the three PBA communications described earlier, that he is entitled to a non-cancelable life insurance with $75,000 of coverage at a cost of $315 annually for the remainder of his life. Put somewhat differently, based upon those three PBA communications, plaintiff alleges that the PBA is estopped from increasing the cost of his term life insurance. Plaintiff's second cause of action for alleged ERISA disclosure violations will be fully outlined in section II below.

The PBA is moving for summary judgment on both counts of the complaint. The court will first address the estoppel based cause of action, and then go on to consider the second cause of action. Insofar as the estoppel cause of action is concerned, the PBA initially contended that ERISA preempts that claim because it is based upon common law contract principles of estoppel, which "relate to" an employee benefit plan and as such is specifically preempted under 29 U.S.C. § 1144(a).[10] The PBA further asserts that even if plaintiff's estoppel claim is construed as an ERISA claim, by its terms, the plan was clearly terminable and thus plaintiff acquired no vested rights thereunder. In response to plaintiff's opposition, the PBA expanded its estoppel argument and is now claiming that the plaintiff cannot rely upon estoppel principles to modify, by informal written communications (the three PBA communications in 1985, May, 1987, and October 29, 1987), the unambiguous, written terms of the US Life insurance contract.

Notwithstanding the preemption doctrine, the plaintiff basically responds that estoppel remedies can be invoked under ERISA, and that the present record supports the availability of such remedies in this case. Thus, the plaintiff vigorously contends that the PBA's motion for summary judgment on the first cause of action must be denied.

### DISCUSSION

## I. ESTOPPEL

On countless prior occasions, this court has recited the standard of review which governs a motion for summary judgment under Fed. R.Civ.P. 56. While the parties are undoubtedly aware of these rules, a few are worth stressing once again. Quite recently the Second Circuit took great pains to reiterate that the court's role on a summary judgment motion "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to decid[e]." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994). The court's "duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.* In engaging in this task there are four oft-repeated rules which must be heeded:

---

10. That statute reads as follows:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

29 U.S.C. § 1144(a) (West 1985).

First, summary judgment may not be granted unless 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists.... In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought.... Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.... When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper....

*Id.* at 1223 (citations omitted). As to this last point, put another way, "[a]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993) (internal quotations omitted) (citations omitted). These general principles will serve as a guide in the court's consideration of these summary judgment motions.

### A. Scope of Plaintiff's Estoppel Cause of Action

Before considering whether estoppel principles may be applied in this ERISA action, the court must first determine the exact parameters of plaintiff's estoppel cause of action. Plaintiff's complaint, which is drafted in a deceptively simple manner, does not differentiate between a claim for promissory estoppel and one for equitable estoppel; he simply asserts one generic "estoppel" claim. *See* Complaint at 2.[11] By contrast, in his memorandum of law plaintiff makes clear that he is asserting two separate estoppel theories: equitable and promissory. Plaintiff's Memorandum of Law at 7–13. But because plaintiff does not believe that there is any "practical significance" between the two, he relies upon the same set of facts to establish both estoppel claims. *See id.* at 10 and n. 1 (quoting *Health Scan, Ltd. v. Travelers Ins. Co.,* 725 F.Supp. 268, 270 n. 4 (E.D.Pa.1989)).[12]

Plaintiff is not alone in his confusion, or at least in his failure to adequately distinguish between these two equitable doctrines. Courts and litigants alike have confused the two. *See, e.g., Frymire v. Painewebber, Inc.,* 107 B.R. 506, 511 (E.D.Pa.1989) (citation omitted) ("The bankruptcy court incorrectly identified the elements of promissory estoppel, instead reciting the standard for equitable estoppel."); *Power East, Ltd. v. Transamerica Delaval, Inc.,* 558 F.Supp. 47, 49–50 (S.D.N.Y.), *aff'd without pub'd opinion,* 742 F.2d 1439 (2d Cir.1983) (because the court was unable to discern from plaintiff's complaint whether it was asserting an equitable or promissory theory of estoppel, the court separately analyzed both theories, enumerating the **different** elements of each). Equitable and promissory estoppel are two separate, albeit closely related theories of recovery, however. In *Ludwig v. NYNEX Service Co.,* 838 F.Supp. 769 (S.D.N.Y.1993), the court distinguished between equitable and promissory estoppel on the basis that the former, unlike the latter, does not require the existence of a promise. *Id.* at 793 n. 45; *see also Trilogy Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691, 697 n. 3 (S.D.N.Y.1981) (distinguishing between equitable and promissory estoppel on the basis that "[e]quitable estoppel depends on a misrepresentation of an existing fact, while promissory estoppel requires a promise con-

---

11. For ease of reference, because the plaintiff failed to number the pages of his complaint, the court took the liberty of doing so.

12. The court in *Health Scan, Ltd.,* while opining that there is no practical distinction between promissory and equitable estoppel (a point with

which this court does not necessarily agree), nonetheless recognized that the former "may serve as an independent cause of action while the latter is utilized as a defense or to preclude a defense from being raised." 725 F.Supp. at 270.

cerning future intent[ ]"). Not only are these two estoppel doctrines often confused because of the overlap in terms of factual analysis, but that confusion is compounded because some courts use promissory estoppel and equitable estoppel interchangeably. *See, e.g., Ransom v. Administrative Committee,* 820 F.Supp. 1429, 1431 (N.D.Ga.1993) (discussing availability of equitable estoppel claim in ERISA case in section designated as "[p]romissory [e]stoppel [c]laim"); and *Bao v. Bank of America,* 84 Civ. 6013, 1986 WL 1807 (S.D.N.Y. Feb. 3, 1986), slip op. at 6 ("In order to invoke the doctrine of equitable, or promissory estoppel, a party must establish four elements."). Other courts, including the Second Circuit, at times fail to distinguish between the two and simply refer to estoppel in generic terms, when closer scrutiny reveals that the court is actually referring only to equitable, as opposed to promissory estoppel. *See, e.g., Lee v. Burkhart,* 991 F.2d 1004, 1009–1010 (2d Cir.1993) (referring to the availability of estoppel principles in ERISA cases, but then going on to discuss only elements of equitable estoppel); *Ludwig,* 838 F.Supp. at 793–795 (same).

▆▆▆ There is a difference though between the elements necessary to establish a claim for equitable estoppel and those necessary to establish a claim for promissory estoppel. The elements of an equitable estoppel claim under ERISA, as interpreted by the Second Circuit are "(1) material representation,[13] (2) reliance and (3) damage." *Lee v. Burkhart,* 991 F.2d at 1009 (citation omitted).[14] A claim for promissory estoppel, on the other hand, requires a showing of " ' 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.' ' " *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989) [15] (quoting *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793 (2d Cir.1986) (quoting in turn *Restatement (Second) of Contracts* § 90 (1981)) (other citation omitted).[16] Additionally, to sustain a claim for promissory estoppel under New York law, a plaintiff must also show that he " 'suffered unconscionable injury.' " *Schwartz v. Newsweek, Inc.,* 653 F.Supp. 384, 389 n. 1 (S.D.N.Y.1986), *aff'd on other grounds,* 827 F.2d 879 (2d Cir.1987).

In the present case, broadly construing plaintiff's complaint, the court will assume

---

**13.** Although the Second Circuit spoke in terms of a representation, when discussing this element, it required a showing of an affirmative misrepresentation. *Lee, supra,* 991 F.2d at 1010. The Second Circuit is not alone in this regard. *See, e.g., Andre v. Salem Technical Services,* 797 F.Supp. 1416, 1427 (N.D.Ill.1992) (emphasis in original) ("ERISA bars only *material mis*representations.")

**14.** The court in *Fortune v. Medical Assoc. of Woodhull, P.C.,* 803 F.Supp. 636 (E.D.N.Y.1992), more expansively defined the elements essential to an equitable estoppel claim under federal common law as follows:

1) the party to be estopped misrepresented material facts; 2) the party to be estopped was aware of the true facts; 3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; 4) the party asserting the estoppel did not know, nor should it have known, the true facts; and 5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation. *Id.* at 643 (quoting *National Companies Health P. v. St. Joseph's Hosp.,* 929 F.2d 1558, 1572 (11th Cir.1991) (other citations omitted); *see also Tregoning v. American Community Mut. Ins. Co.,* 12 F.3d 79, 83 (6th Cir.1993) (same).

**15.** The court is fully cognizant of the fact that *Arcadian Phosphates* is not an ERISA case. However, the court's research did not disclose any reported cases stating, or even implying, that in an ERISA case the elements of a promissory estoppel claimed based on federal common law principles are any different than those of an ordinary estoppel claim. Thus, if it eventually becomes necessary for the court to analyze plaintiff's promissory estoppel claim in this case, at least insofar as the elements are concerned, the court will look to state law. *Krishna v. Colgate Palmolive Co.,* 7 F.3d 11, 14 (2d Cir.1993) (ERISA case wherein Second Circuit acknowledged that "[i]n developing federal common law, . . ., resort may be had to state law in a proper case[ ]").

**16.** *See also Farley v. Benefit Trust Life Ins. Co.,* 90–761–C–7, 1991 U.S. Dist. LEXIS 21034, at *17 (E.D.Mo. Oct. 17, 1991) (citations omitted) (four essential elements of promissory estoppel claim under ERISA: "(1) a promise, (2) detrimental reliance on the promise, (3) injustice can only be avoided by enforcement of the promise, and (4) the promisor should have or did in fact clearly foresee the precise action which the promisee took in reliance.")

that he is relying upon the doctrines of both equitable and promissory estoppel. The issue thus becomes whether under ERISA he is entitled to rely upon those estoppel doctrines, or whether, as the PBA suggests, ERISA preempts altogether an estoppel based cause of action. If the PBA is correct, then obviously the court's inquiry would end and the PBA would be entitled to summary judgment on plaintiff's first cause of action for "estoppel."

### B. ERISA Preemption

At the outset, there are several relevant undisputed facts as to the status of the PBA and its group life insurance program which must be noted. First, there is no question that the PBA is an "employee organization" within the meaning of ERISA, 29 U.S.C. § 1002(4),[17] and the PBA admits that. Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("PBA Memorandum") at 9. It is also undisputed and indeed the PBA has stipulated that its group term life insurance program is subject to ERISA. *Id.* at 9, n. 6. Nor is it contested that the PBA's group life insurance program constitutes an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1),[18] in that its purpose is to provide participating members and their beneficiaries insurance benefits in the event of death. Additionally, as the plan's sponsor for its group life insurance program, the PBA is the plan's administrator. *See* 29 U.S.C. § 1002(16)(A).[19] ERISA requires that all employee benefit plans "shall be established and maintained pursuant to a written instrument."[20] 29 U.S.C. § 1102(a)(1) (West 1985). In this case, the written instrument required by ERISA is the PBA's group life insurance policy underwritten by US Life. That policy was in effect from June 1, 1985 through November 30, 1988. Finally, the plan at issue is an unfunded welfare benefit plan,[21] as opposed to a multi-employer pension benefit plan.[22] The significance of this

17. That statute defines an "employee organization" as:
   [a]ny labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employee's beneficiary association organized for the purpose in whole or in part, of establishing such a plan.
   29 U.S.C. § 1002(4) (West Supp.1994).

18. Such a plan is defined under ERISA as follows:
   [a]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
   29 U.S.C. § 1002(1) (West Supp.1994).

19. Under ERISA, the term "administrator" includes, *inter alia,* the plan sponsor if an adminis-

trator is not specifically designated by the terms of the instrument under which the plan is operated. 29 U.S.C. §§ 1002(16)(A)(i) and 1002(16)(A)(ii) (West Supp.1994).

20. The significance of this requirement cannot be understated, as the Fifth Circuit emphasized in *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290 (5th Cir.1989):

   The policy behind the "written instrument" clause in ERISA is to prevent collusive or fraudulent side agreements between employers and employees. But for the "written instrument" clause, employees could discriminate in favor of certain plan participants to the detriment of others. In addition, the writing requirement gives the plan's participants and administrators a clear understanding of their rights and obligations.
   *Id.* at 1296.

21. Letter of Donald J. Aquilio to Court (May 3, 1993) at 2.

22. ERISA distinguishes between "pension" benefits and "welfare" benefits. *See* 29 U.S.C. § 1002(2) and § 1002(1). The significance of this distinction was thoroughly discussed by the Second Circuit in *Reichelt v. Emhart Corp.,* 921 F.2d 425 (2d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991):

   In recognition of the expense of maintaining and administering employee benefit plans, Congress structured ERISA to impose the most

distinction will become evident further on in the court's analysis.

With those factual underpinnings, the court is now in a position to address whether plaintiff's estoppel cause of action is preempted by ERISA. The broad scope of ERISA preemption is well recognized. State common law causes of action are generally preempted thereunder. *See, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 288 (2d Cir.1992) (citations omitted) ("A state common law action which merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted."); *National Companies,* 929 F.2d at 1571 (citations omitted) ("ERISA preempts all state common-law claims relating to employee benefits plans, including equitable estoppel claims."); and *Reichelt,* 921 F.2d at 431 ("ERISA preempts civil actions against employers for severance pay predicated on common-law contract principles."). Indeed, the Supreme Court has observed that "ERISA's preemption clause is 'conspicuous for its breadth,' ..., representing Congress' aim to establish as an area of 'exclusive federal concern' the regulation of employee benefit plans." *Diduck,* 974 F.2d at 287 (quoting *FMC Corp. v. Holliday,* 498 U.S. 52, 56–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)). Thus, plaintiff Aquilio wisely concedes that if his first cause of action were based upon state law estoppel principles, then it would be preempted by ERISA. Plaintiff's Memorandum at 7.

Plaintiff points out, however, that the PBA has misconstrued the nature of his estoppel claim. According to the plaintiff, this claim is not based upon state law contract principles, but rather upon ERISA's civil enforcement provision. In particular, plaintiff is relying upon section 1132(a)(3)(B) of ERISA, which states:

> A civil action may be brought—
>
> .     .     .     .     .
>
> by a participant, beneficiary, or fiduciary ... to obtain **other** appropriate **equitable relief** (i) to redress such violations or (ii) **to enforce** any provisions of this subchapter or **the terms of the plan;** ....

29 U.S.C. § 1132(a)(3)(B) (West 1985) (emphasis added). Plaintiff contends that an estoppel claim may properly be asserted under this provision, irrespective of ERISA's preemption provisions.[23]

Even in the face of ERISA's broad preemptive scope, over the years courts have started to recognize a so-called "federal common law" doctrine of estoppel in the ERISA context. This doctrine has taken various forms, some of which will be more fully discussed herein. At this point in the court's analysis, however, the Second Circuit's decision in *Lee v. Burkhart,* is dispositive of the issue of whether this Circuit recognizes the availability of federal common law estoppel principles in ERISA actions. The Court in *Lee* expressly held that "under 'extraordinary circumstances' principles of estoppel can apply in ERISA cases."[24] 991 F.2d at

stringent requirements in connection with pension plans and left the employer with considerable flexibility with respect to welfare plans.... Thus, employee pension benefit plans are subject to elaborate accrual, vesting, and funding requirements.... On the other hand, welfare benefit plans, though subject to certain disclosure and fiduciary requirements, ..., 'are exempt from the more stringent ERISA requirements', ..., and welfare benefits are thus unaccrued and nonvested.
*Id.* at 429–430 (quoting *Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1045 (7th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988)) (other internal citations omitted).

**23.** The "appropriate equitable relief" which plaintiff is seeking in this case as to his first cause of action is "[a] declaration that the PBA is bound to a contract with plaintiff and to provide a full life policy to plaintiff at the rates originally represented to plaintiff and that plaintiff is entitled to a return of all premiums paid in excess of such amount, with prejudgment interest[.]" Complaint at 5, ¶ A. The plaintiff seeks a similar declaration with respect to his spouse's policy. *Id.* at 5, ¶ B.

**24.** The Second Circuit is not alone in this view. A number of other Circuit Courts have also recognized the applicability of estoppel principles in the ERISA context. But, as will be discussed, the circumstances under which they have done so varies. *See, e.g., Black v. TIC Inv. Corp.,* 900 F.2d 112, 114–15 (7th Cir.1990) (allowing application of estoppel principles to ERISA claim); *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285–86 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (allowing application of estoppel principles where interpreting ambiguities in benefit plans); *Dockray v. Phelps*

1004 (citing, *inter alia, Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1039 (2d Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986)).

*Lee* does not represent the first time the Second Circuit has been willing to recognize the possibility that estoppel principles may have some applicability in the ERISA context. In *Haeberle v. Board of Trustees,* 624 F.2d 1132 (2d Cir.1980), for example, the Court recognized the availability of the estoppel doctrine in an ERISA case, but then went on to stress that the party seeking to invoke the same must "prove *every* element of the doctrine." *Id.* at 1139 (emphasis added). Because plaintiff Haeberle could not meet that strict standard of proof, the Court ultimately upheld the district court's determination that plaintiff was not entitled to rely on an estoppel theory of recovery. *Id.* at 1140.

■ In a similar vein, the Court in *Chambless* upheld the district court's grant of summary judgment dismissing plaintiff's claim that the multi-employer pension plan should be estopped from suspending his pension benefits. Significantly, the Second Circuit did not affirm on the basis of the unavailability of estoppel principles; rather it found that plaintiff's allegations pertaining to representations made by a union representative were insufficient to support an estoppel claim. *Chambless,* 772 F.2d at 1041. Thus, because the Second Circuit has acknowledged several times that estoppel principles may be invoked in an ERISA case, the court declines to adopt a blanket prohibition to the contrary, as the PBA seems to be urging. Instead, as a general proposition, the court is

willing to acknowledge that, in certain circumstances, federal common law estoppel principles can apply to some ERISA claims.

Plainly the case law just discussed would be a sufficient basis for allowing plaintiff Aquilio to rely upon estoppel principles herein. The court also finds persuasive, though not necessarily determinative, the policy reasons offered by several other courts as justification for allowing estoppel principles to be applied in ERISA actions. In actions involving multi-employer pension benefit plans, courts have been reluctant to invoke estoppel principles. *See, e.g., Black,* 900 F.2d at 115. That reluctance arises out of a concern for the actuarial soundness of such plans. *See id.* By contrast, in a case such as this, "there is no particular fund which is depleted by paying benefits. Thus there is no need for concern about the Plan's actuarial soundness." *Id.* With respect to these unfunded welfare plans, the Seventh Circuit in *Black* explained in greater detail:

> [w]here there is no danger that others associated with the Plan can be hurt, there is no good reason to breach the general rule that misrepresentations can give rise to an estoppel. There is no reason for the employee who reasonably relied to his detriment on his employer's false representations to suffer. There is no reason for the employer who misled its employee to be allowed to profit from the misrepresentation.

*Id.* It is true that subsequent cases have brought the validity of *Black* into question by emphasizing that ERISA places central importance on the written plan. *Peachin v. Aetna Life Insurance Co.,* 92 C 2739, 1994

*Dodge Corp.,* 801 F.2d 1149, 1155 (9th Cir.1986) ("[e]ven though ERISA preempts common law theories of contract law the principles of equitable estoppel apply to pension plans."). The court is mindful that, as the PBA mentions, several other Circuit Courts have taken the opposite approach and have declined to allow federal common law estoppel principles to be applied in ERISA actions. *See, e.g., Williams v. Bridgestone/Firestone, Inc.,* 954 F.2d 1070, 1072–73 (5th Cir.1992) (disallowing application of estoppel principles); *Straub v. Western Union Tel. Co.,* 851 F.2d 1262, 1265–66 (10th Cir. 1988) (same); *Nachwalter v. Christie,* 805 F.2d 956, 960–61 (11th Cir.1986); *Holland v. Burlington In-*

*dustries, Inc.,* 772 F.2d 1140, 1147 (4th Cir.1985), *aff'd without opinion,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986) and *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). However, because this court lies within the Second Circuit, it is bound to apply the law of that Court even in the face of opposing views from other Circuits. *See In Re Pan American Corp.,* 950 F.2d 839, 847 (2d Cir.1991) ("Of course, [*In re Air Disaster in*] *Lockerbie* [733 F.Supp. 547 (E.D.N.Y. 1990)] made the preemption determination for the district courts in the Second Circuit; they are bound to apply that decision even if other circuits may have different views.").

WL 61793, at *4, 1994 U.S.Dist. LEXIS 1987, at *12 (N.D.Ill. Feb. 24, 1994) (and cases cited therein at n. 6). In *Thomason v. Aetna Life Ins.*, 9 F.3d 645, 650 (7th Cir.1993), however, the Seventh Circuit explicitly reaffirmed its reasoning in *Black*. Therefore, in this court's view *Black* remains persuasive authority especially because the Second Circuit has not yet had the opportunity to speak definitively on this point.

Here, the parties did not focus extensively on this distinction between a single-employer welfare benefit plan and a multi-employer pension benefit plan. In fact, the PBA completely ignored it. Nevertheless, several facts relevant to this issue can be easily gleaned from the record. First, this is an action against the administrator of an unfunded welfare benefit plan; it is not against a multi-employer pension benefit plan. The insurance premiums here are paid by the employee, or as in the case of plaintiff Aquilio, the former employee. Further, the court can safely assume that unlike a multi-employer pension benefit plan, the US Life policy, as a welfare benefit plan, did not involve any sharing of losses and profits among participants' accounts. In short, because the plan at issue is an unfunded welfare benefit plan, concerns of actuarial soundness, such as the Court described in *Black*, are absent.

■ Moreover, although the PBA offers a host of reasons as to why plaintiff Aquilio should not be allowed to rely upon estoppel principles, threat to actuarial soundness of the plan is not one of them. Thus, the court is convinced that there are also strong policy reasons weighing in favor of permitting application of federal common law estoppel principles here. Consequently, because the court interprets plaintiff's estoppel cause of action as one based upon federal common law principles, rather than upon state common law, the court finds that plaintiff's first cause of action is not preempted by ERISA. So,

for the moment anyway, plaintiff is able to survive the PBA's summary judgment motion. In other words, the court cannot find, at least at this juncture, that ERISA preempts plaintiff's first cause of action as a matter of law.

### C. Scope of the Plan

Even in the face of ERISA's undeniably broad preemption provisions,[25] as just stated, the court is willing to acknowledge, in certain situations, the applicability of federal common law estoppel principles in the ERISA setting. That recognition leads the court to its next level of inquiry. The court is now faced with the issue of whether the doctrines of equitable and/or promissory estoppel are available to plaintiff Aquilio under the unique facts of this case. Perhaps anticipating that the court would find, as it did, that plaintiff's estoppel cause of action is not preempted under ERISA as a state law based cause of action, the PBA further argues that, nonetheless, such a cause of action is not permissible because plaintiff Aquilio is seeking to modify or amend the unambiguous terms of the US Life policy.

In particular, according to the PBA, based on an estoppel theory plaintiff Aquilio is attempting to obtain insurance through the PBA under the US Life policy for the remainder of his life at a fixed rate, despite the fact that that policy clearly and unambiguously provides that it could be changed, renewed, or terminated without notice. In that regard, the PBA points to the first page of the Certificate of Insurance. Under the heading *IMPORTANT NOTICE*, it unequivocally states: "The group policy is a contract between United States Life and the Policyholder [the PBA]. **It** [the group policy] **may be changed or ended without notice to or consent of any insured person.**" Canfield Affidavit, exh. G thereto (emphasis added). Likewise, the US Life plan summary booklet[26] contained the exact same provision.

---

25. In addition to section 1144(a), ERISA contains two additional preemption provisions. *See* 29 U.S.C. §§ 1144(b) and 1144(b)(2)(B).

26. It was not until December, 1991, that the PBA filed its SPD with the DOL. *See* Canfield Affidavit, exh. E thereto. That SPD pertains to the

PBA's subsequent life insurance policy with Preferred Life, however. It does not pertain to the US Life policy which is the subject of this litigation. Evidently, no document specifically designated as a SPD was filed with the DOL in connection with the US Life policy at issue in this action.

*Id.,* exh. A thereto. Therefore, in the PBA's view, the US Life plan was clearly terminable and thus it does not have an obligation, as plaintiff believes, to indefinitely maintain his life insurance coverage at the rate of $26.00 per month with a $75,000.00 death benefit.[27]

The PBA's argument that the plan is unambiguous and does not support a claim for vested benefits in the nature of those sought by plaintiff is predicated upon the assumption that the US Life policy itself and the plan summary booklet constitute the plan. Hence, the PBA contends that the court should not look beyond those documents, such as to the selective written communications relied upon by plaintiff, to determine plaintiff's rights thereunder. Not surprisingly, plaintiff takes a more expansive view than does the PBA of what documents constitute the plan. Plaintiff impliedly contends that the plan includes not only the US Life policy and the plan summary booklet, but also the three PBA written communications from 1985, May, 1987, and October 29, 1987.

█ Given these opposing views, the court must determine what documents comprise the·plan at issue.[28] The resolution of this issue is critical in part because in *Moore,* a case heavily relied upon by the PBA, the Second Circuit explicitly held "that the unambiguous provisions of the plan must govern, because altering a welfare benefit plan on the basis of **non-plan documents and communications,** absent a particularized showing of conduct tantamount to fraud, would undermine ERISA." 856 F.2d at 489 (emphasis added). In reaching that conclusion, the Court soundly reasoned:

> Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans. This intention was based on a sound rationale. Were all communications between an employer and plan beneficiaries to be considered along with the SPDs as estab-

lishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created.

*Id.* at 492. The *Moore* Court therefore concluded that, "absent a showing tantamount to proof of fraud, an ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries." *Id.* (emphasis added). The record in *Moore* did not contain a "hint of bad faith, intent to deceive or even conduct that was objectively, if unintentionally, misleading[.]" *Id.* Therefore, the plaintiffs, a group of retirees challenging the employer's decision to modify unilaterally their benefits plan, could not overcome the rule prohibiting amendment of a plan based upon extrinsic evidence, such as non-plan documents. The *Moore* Court's holding that welfare benefit plans are not subject to amendment based upon non-plan documents and communications furthers ERISA's mandate that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).

In a more recent case, *DeGrooth v. General Dynamics Corp.,* 837 F.Supp. 485 (D.Conn.1993), the plaintiffs argued, *inter alia,* that the court should look to inter-office memoranda to define the terms of a plan providing life and medical insurance benefits because the defendants had not amended the SPD or issued a new one for seven years. Relying exclusively upon *Moore,* the district court rejected that argument, holding that the plaintiff could not rely on inter-office memoranda to define the terms of the plan because "under *Moore,* the plan documents and the SPD exclusively govern the terms of the plan." *Id.* at 488.

27. In his complaint, plaintiff does not specifically set forth the relief which he is seeking in terms of dollar values; but in the proposed order he submitted in connection with this motion, these are the figures he provided.

28. "The scope of a welfare plan is defined by the summary plan description and the official plan documents." *In re Unisys Corp. Retiree Medical Benefits ERISA Lit.,* 837 F.Supp. 670, 674 (E.D.Pa.1993) (citing *Henglein v. Informal Plan for Plant Shutdown Benefits,* 974 F.2d 391, 400 (3rd Cir.1992); *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988)).

Plaintiff Aquilio responds that *Moore* is not controlling because, among other reasons, the plaintiffs therein were relying on informal communications, whereas he is relying on "non-ERISA mandated written communications." Plaintiff's Memorandum at 11. The court fails to see this distinction, unless perhaps plaintiff believes that the communications here were formal, as opposed to informal. In any event, it strikes the court that the items relied upon by the plaintiffs in both *Moore* and *DeGrooth* are remarkably similar to the communications upon which plaintiff Aquilio relies. In *Moore*, the plaintiff relied upon a host of informal communications, such as non-SPD booklets explaining the group insurance benefits, filmstrips, articles, memoranda and letters. Plaintiff DeGrooth relied strictly on inter-office memoranda. In the court's view, the three written PBA communications earlier described, and which form the basis for plaintiff's estoppel cause of action, for all practical purposes, are no different than the informal communications relied upon by the plaintiffs in both *Moore* and *DeGrooth*. Therefore, the court sees no basis for distinguishing *Moore*, or for that matter *DeGrooth*, from the present case, based upon the type of non-plan documents involved.[29]

### D. "Particularized Showing of Conduct Tantamount to Fraud"

As a further means of avoiding the obvious implication of *Moore* in this case, plaintiff Aquilio strenuously argues that, in contrast to *Moore*, the record here supports a finding that the PBA's conduct was "objectively, even if unintentionally, misleading."[30] Letter of Plaintiff's Counsel to Court (May 5, 1992) at 2. To support this assertion, plaintiff initially pointed to the fact that he received these communications against a back-

drop of union electioneering. He seems to have retreated somewhat from that position, perhaps based upon the sequence of events as set forth in the PBA's Memorandum of Law in Opposition to Plaintiff's Cross Motion for Summary Judgment ("PBA Opposition Memorandum"), which strongly suggests that the PBA was not in the midst of a competition with the union during the relevant time period. PBA Opposition Memorandum at 7–8. Regardless, plaintiff now stresses that, more importantly, the union and the PBA had an ongoing competition as to which organization could provide the best fringe benefits. As evidence of this alleged competition, plaintiff notes that the 1985 correspondence included a chart comparing the various life insurance benefits available through the PBA with those available through the union. *See* Complaint, exh. A thereto. Plaintiff believes that given this supposed vying between the union and the PBA, the PBA's conduct was "objectively, if unintentionally, misleading," and thus *Moore* is irrelevant to the motions currently before the court.

Before considering whether the foregoing is sufficient to allow plaintiff Aquilio to circumvent *Moore*'s prohibition against the use of non-plan documents to amend a written welfare plan governed by ERISA, the court must try to discern what the *Moore* Court meant when it referred to conduct which is "objectively, if unintentionally, misleading." The parties disagree as to what standard the *Moore* Court intended when it employed that phrase. The PBA opines that despite that phrase, *Moore* requires fraud before a plan is subject to amendment by informal communications. On the other hand, the plaintiff asserts that the PBA is reading *Moore* far too restrictively, and that *Moore* can be read

---

29. At this point, the court is also compelled to observe that insofar as plaintiff Aquilio may be arguing that the three PBA generated communications are sufficiently formal to rise to the level of a "plan document," the court also cannot accept that argument. Just as in *Alday v. Container Corp. of America*, 906 F.2d 660 (11th Cir. 1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991), none of those three documents "fulfill the requirements for plan descriptions and summary plan descriptions as set out at 29 U.S.C. § 1022." *Id.* at 665. These

communications do "not describe the plan's terms, specify its benefits or coverage, or define eligibility requirements or limitations." *Id.* Thus, given those obvious and serious omissions, in the court's view, there is no basis for finding that any of these three communications constitute a formal "plan document."

30. The plaintiff misquotes *Moore* here; the *Moore* quoted did not include "even" in this particular part of that phrase.

as requiring proof of conduct which is only "objectively, if unintentionally, misleading," although he does not elaborate on the possible meaning of that phrase.

Unfortunately· the *Moore* Court did not specifically define "objectively, if unintentionally, misleading" behavior. Nor did it provide much direct guidance as to the kind of evidence which would be necessary to demonstrate such behavior on the part of a plan administrator such as the PBA. Nonetheless, *Moore* is instructive on this point if one examines the evidence therein which did **not** rise to the level of "objectively, if unintentionally, misleading" behavior. The *Moore* Court refused to find "bad faith, intent to deceive or even conduct that was objectively, if unintentionally, misleading" because for more than seventy years the SPDs and, with one exception, all of the books explaining plan benefits "indicated in a straight forward way [defendant's] reservations of a right to amend or terminate." 856 F.2d at 492. In the one booklet which omitted such a reservation of rights, it mentioned that it was not a governing plan document, and that it was not a complete statement of the plan's terms. *Id.* The other informal communications relied on by the plaintiffs therein also did not purport to be "complete binding statements of plan terms." *Id.* at 493. Furthermore, in closing the Court observed that "[w]hile the use of language such as "lifetime" or "at no cost" might conceivably create a triable issue of fact on a contract theory, it does not constitute the kind of misleading behavior that would cause us to override plan documents and SPDs created pursuant to ERISA." *Id.* at 493. Along those same lines, even though some of the presentations over the years "occasionally described these benefits as being for the employee's 'lifetime,' and 'at no cost[,]'" significantly, the Second Circuit expressly stated that that was not enough to establish "a particularized showing of conduct tantamount to fraud[.]" *Id.* at 489 and 490.[31]

In the present case, after careful consideration, the court cannot find that the record supports a "particularized showing of conduct tantamount to fraud," such as would take this case outside the realm of the Court's holding in *Moore*. In the court's opinion, even with the "objectively, if unintentionally, misleading" language, the *Moore* Court still intended to hold plaintiffs to a rigorous standard of proof if they want to rely on non-plan documents to alter or amend the terms of a written plan. Plaintiff attempts to dilute this standard by reading the just quoted language in isolation. However, the phrase "tantamount to proof of fraud" precedes the phrase "objectively, if unintentionally, misleading." *See,* 856 F.2d at 492. As previously mentioned, at the outset the *Moore* Court held that: "[u]nambiguous provisions of the plan must govern, because altering a welfare benefit plan on the basis of non-plan documents and communications, **absent a particularized showing of conduct tantamount to fraud,** would undermine ERISA." *Id.* at 489 (emphasis added). Thus, in the court's view while "objectively, if unintentionally, misleading" when read in isolation, could very well mean conduct far short of fraud, reading *Moore* as a whole, the court is not left with that impression.

Nor is the court persuaded that the Second Circuit's later decision in *Howard v. Gleason Corp.,* 901 F.2d 1154 (2d Cir.1990), upon which the plaintiff places so much credence, displaces *Moore.* According to plaintiff, "*Howard* evidences a reading of the 'tantamount to fraud' language of *Moore* that is much broader in remedial impact than the PBA's interpretation of the *Moore* decision." Letter of Plaintiff's Counsel to Court (May 3, 1993) at 1. In particular, the plaintiff points to the *Howard* Court's observation that "[a]n employee's right to a comprehensible summary of plan benefits would be hollow if employers could distribute supplementary

---

31. As an aside, the court observes that requiring proof tantamount to fraud in this context appears to be consistent with the Second Circuit's more recent holding in *Lee v. Burkhart,* requiring a showing of "extraordinary circumstances," in order to rely on estoppel principles in an ERISA case. 991 F.2d at 1009. The obvious factor underlying the *Lee* and *Moore* decisions was a valid concern about undermining ERISA's comprehensive regulatory scheme for welfare and pension benefit plans, if aggrieved plan participants are regularly allowed to rely on non-plan documents to establish their rights thereunder.

documents or make oral representations contradictory to a previous summary description and still be said to have satisfied their ERISA disclosure obligations." *Id.* at 1160 (citations omitted). At first glance this language does seem helpful to plaintiff Aquilio. For several reasons though, the court does not agree with the plaintiff that *Howard* mandates a different result in this case.

In *Howard* the Court eventually upheld a grant of summary judgment in favor of the employer benefit provider, finding that defendants had complied with their ERISA obligations to inform Mr. Howard of his conversion rights under the plan. *Id.* The Court reasoned that the non-plan document upon which that plaintiff relied did not "undermine the adequacy of the summary plan descriptions because it does not contradict them." *Id.* Thus, because the Court did not find a contradiction between the SPD and the non-plan documents (a lay-off policy), it did not need to address under what circumstances it might be appropriate to look to non-plan documents in an ERISA case. Furthermore, the aspect of *Howard* upon which plaintiff places so much emphasis was purely dicta, and as such this court need not accord it a great deal of weight. *See United States v. Johnson,* 14 F.3d 766, 769 (2d Cir.1994) (Court declining to follow its own earlier decision where intent issue not before Court in that decision, but was simply addressed in dictum). Consequently, the court does not find *Howard* particularly valuable in its analysis of the issues presented herein.

■ Turning now to the proof before the court on these motions, conspicuously absent is a particularized showing of conduct tantamount to fraud. Certainly union electioneering and competition between the union and the PBA, allegations which are not even specifically set forth in the complaint, are not the type of proof the *Moore* Court envisioned as being tantamount to fraud. Furthermore, although the factual record is not quite as compelling as it was in *Moore,* there is proof in the record before this court that, as in *Moore,* the US Life Certificate of Insurance as set forth in the policy itself, contained an express reservation of right to amend or terminate. Canfield Affidavit, exh. G thereto. That reservation of right was also contained in the US Life plan summary. *Id.,* exh. A thereto. Additionally, as did the US Life policy, a number of PBA procured policies, of which plaintiff availed himself in the years preceding the US Life policy, also contained nearly identical reservation of rights clauses with respect to the right to amend or terminate coverage. *See, e.g.,* Canfield Affidavit, exhs. C and D thereto.

Also, the court cannot overlook the fact that at least since 1980, all of the term life insurance contracts which the PBA had entered into on behalf of its members were limited in duration; they each had rates that the PBA could maintain only for a maximum of three years. *Id.* at ¶ 27. This is fully consistent with PBA Treasurer Fairchild's representation that since 1961 only term life insurance was available through the PBA. Fairchild Affidavit at ¶ 25. Further, PBA President Canfield avers, "No [PBA] term life insurance program that ever came to my attention offered fixed rates on a long-term basis, or for the life of the insured individual." *Id.* at ¶ 26. Accordingly, because the record as a whole does not show "bad faith, intent to deceive or even conduct that was objectively, if unintentionally, misleading" on the part of the PBA, the court finds that under *Moore* the US Life policy and the plan summary exclusively govern the terms of the plan.

To this point the court has deliberately avoided one other important aspect of *Moore* and that is the fact that the plan there was unambiguous. Obviously then, if plaintiff Aquilio could show that the US Life plan is ambiguous, then the PBA's reliance upon *Moore* would be significantly undermined. Plaintiff is not able to do that, however. First of all, there are no allegations in the complaint that either the plan or the plan summary are ambiguous. Nor does plaintiff expressly argue on these motions that he should be permitted to rely on estoppel principles because the plan is ambiguous in some respect. In fact, in a slightly different context, at one point the plaintiff specifically contends that the 1985 communication was a "new plan" and "involved substantial **modifications** to the existing PBA plan." Plain-

tiff's Memorandum at 11 (emphasis added). Additionally, as previously stated, the plain language of both the policy and the plan summary indicated that the US Life policy could be changed or terminated at any time without notice. It is difficult to imagine language any more plain and unequivocal than the following: "The group policy is a contract between United States Life and the Policyholder. It may be changed or ended without notice to or consent of any insured person." Canfield Affidavit, exh G thereto. The present case can be easily contrasted with *Kane* where the Court found that "reasonable person could disagree as to [the] meaning and effect" of plan provisions. *Kane*, 893 F.2d at 1285. Based upon the plain and unequivocal language of the official plan documents before the court on these motions, the court is unable to find an ambiguity here. This absence of an ambiguity provides additional support for the court's view that *Moore* significantly impacts the present case.

### E. Interpretation v. Modification

■■■ Absence of an ambiguity is significant for another reason. In deciding whether to permit application of federal common law estoppel principles in ERISA cases, some courts have focused on whether the plaintiff is seeking to interpret an ambiguous plan provision, as opposed to seeking modification of an unambiguous provision.[32] The Eleventh Circuit made this distinction in *Kane* when it allowed estoppel principles to be applied to a medical benefits plan because the plan provisions were ambiguous; and the plaintiff was relying on oral representations made by the insurer which interpreted but did not modify the plan terms. 893 F.2d at 1285–1286. Even if this court were to follow the Eleventh Circuit's lead in *Kane*,[33] and find that estoppel principles may be applied to interpret ambiguous plan provisions, plaintiff Aquilio still could not defeat the PBA's summary judgment motion on his first cause of action because, in contrast to *Kane* and its progeny, as previously noted, this plaintiff is arguing for a modification in the written US Life policy. He is not contending that the written plan itself is ambiguous and thus subject to interpretation by as the 1985, May, 1987, and October 29, 1987 written PBA communications. Consequently, as have other courts when faced with similarly unambiguous plan provisions,[34] this court concludes that even if it were to go so far as to adopt the reasoning of *Kane* and its progeny, plaintiff Aquilio would not be entitled to take advantage of the same because the plan documents here simply are not ambiguous.

**32.** See, e.g., *National Companies*, 929 F.2d at 1572 (federal common law equitable estoppel applied to interpretations of ambiguous ERISA plan provisions); *Alday, supra*, 906 F.2d at 666 (promissory estoppel claim barred in ERISA case where SPD was unambiguous); *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.), *cert denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); *Reid v. Gruntal & Co., Inc.*, 760 F.Supp. 945, 950–951 (D.Me.1991) (estoppel claim permitted to stand in an ERISA case where plan was ambiguous and defendant's alleged representations were interpretations and not modifications of the ambiguous language); and *Fischer v. Philadelphia Electric Co.*, No. 90–8020, 1992 WL 187107 at *23, 1992 U.S.Dist. LEXIS 11395 at *62 (E.D.Pa. July 28, 1992) ("[f]ederal common law claim of estoppel may be applied when an employee relies, to his detriment, on an interpretation of an ambiguous provision in a plan by a representative of that plan") (citation omitted).

**33.** This Circuit has not yet had occasion to either accept or reject *Kane* and the so-called "interpretation estoppel" doctrine espoused therein; but the court in *Gonyea v. John Hancock Mutual Life Insurance Co.*, 812 F.Supp. 445 (D.Vt.1992) opines that the Second Circuit is "aligned with this distinction between amendments or modifications to employee benefit plans and interpretations of those plans and the use of common law remedies in relation to them." *Id.* at 449.

**34.** See *Russo v. Health, Welfare & Pension Fund*, 984 F.2d 762, 768 (7th Cir.1993) (declining to adopt interpretation/modification distinction, but finding in any event that the plan provision was not ambiguous); *Schoonmaker v. Employee Savings Plan*, 987 F.2d 410, 414 (7th Cir.1993) (silence of plan documents differs from ambiguity at issue in *Kane*, thus even if the court adopted the *Kane* distinction, the plan's informal practice did not conform with *Kane*'s narrow exception to the writing requirement); *Greany v. Western Farm Bureau Life Insurance Co.*, 973 F.2d 812, 822 (9th Cir.1992) (federal common law estoppel claim unavailable where plan language unambiguous); *Rosile v. Aetna Life Ins. Co.*, 777 F.Supp. 862, 871·n. 11 (D.Kan.1991) (*Kane* inapplicable because plan was unambiguous); *Roth v. BFI Long–Term Disability Group Insurance Plan*, No. 91–2563, 1992 WL 300842, at *4, 1992 U.S.Dist. LEXIS 15702, at *10 (E.D.La. Oct. 14, 1992) (same).

Thus *Kane* and its progeny do not alter the court's opinion that plaintiff Aquilio is not entitled to rely upon estoppel principles to circumvent the plain, unambiguous written terms of an unfunded welfare benefit plan—the US Life policy.

Plaintiff is not entitled to rely on estoppel principles based upon *Kane* for an additional reason. Besides requiring a showing of ambiguity, the rule enunciated in *Kane* only comes into play when the plaintiff is seeking to interpret a plan provision. Plaintiff Aquilio is not seeking to interpret an ambiguous plan provision; rather, by his own admission, he is seeking to modify unambiguous plan documents, and that he cannot do. The court's determination that plaintiff is prohibited from modifying the unambiguous plan documents is consistent with the position taken by several other Circuit Courts which have had occasion to examine cases factually similar to the present one. To illustrate, in *Miller v. Coastal Corp.*, 978 F.2d 622 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993), the Court refused to allow an ERISA plan to be modified under a theory of common law estoppel by informal written communications. *Id.* at 625. The Court reasoned that such modification would conflict with ERISA's explicit requirement that all modifications to an employee benefit plan be written. *Id.* (citing 29 U.S.C. § 1102(a)(1)). Further explained the Court, all plan modifications must also conform to ERISA's formal amendment procedures. *Id.* (citing 29 U.S.C. § 1102(b)(3)). Thus, even though the written communications upon which the plaintiff sought to rely in *Miller* consisted of summaries of his benefits under a pension plan sent annually over a ten-year period of time, the Court was still unwilling to permit the plaintiff to invoke estoppel principles. *Id.*

Likewise, in *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir.1992), the Fourth Circuit definitively held that "estoppel was unavailable to alter the unambiguous terms of an ERISA welfare benefit plan." *Id.* at 60. The Court there did not need to decide whether to follow the Eleventh Circuit's reasoning in *Kane* because that case "involve[d] an outright modification, not an interpretation of the plan." *Id.* at 59. The Court explained: "[e]stopping Nationwide [the defendant insurer] from terminating the contract of insurance when no premiums were paid would have the effect of providing [plaintiff] Coleman benefits even though the contract unambiguously indicates that she was entitled to none." *Id.* The Court concluded that such a result amounted to an impermissible modification of the plan's termination provision.

*Coleman* is significant for another reason. As in the present case, *Coleman* involved a dispute arising in connection with an employee welfare benefit plan, not a pension plan. Plaintiff Coleman attempted to convince the Court that because an employee welfare benefit plan was at issue, estoppel principles could still be applied because concerns over protecting the actuarial soundness of the plan were not present, as they would be with a pension plan. The plaintiff also pointed to the fact that welfare benefit plans are unfunded and thus lack the stringent accrual and vesting requirements of pensions plans. *Id.* at 59. The plaintiff was not successful on that argument; the Fourth Circuit declined to distinguish between pension plans and welfare benefit plans because, for one reason, ERISA's written instrument requirement applies to "every employee benefit plan." *Id.* (quoting 29 U.S.C. § 1102(a)(1)). Lastly, the *Coleman* Court persuasively reasoned that:

> [S]everal important purposes of ERISA would be impeded through use of estoppel principles in welfare benefit plan cases. ERISA is designed 'to promote the interests of employees and their beneficiaries in employee benefit plans,' ..., as well as 'to protect contractually defined benefits,'.... It requires a crabbed reading of these purposes to suggest that they are directed solely at the actuarial soundness of pension plans. Indeed, the Seventh Circuit has recently recognized that 'one of ERISA's purposes is to protect the financial integrity of pension and *welfare* plans by confining benefits to the terms of the plans as written.' ... The financial integrity of a group health insurer could be quickly compromised if courts compelled the insurer to assume risks for which no premium was ever paid. Moreover, if courts allowed

estoppel to be used to modify ERISA plans, plan assets could also be chewed up in costly, litigious disputes over what informal modifications may have been made to a written instrument.

*Id.* at 60 (internal citations omitted) (emphasis in *Coleman*).

■ To summarize, as to plaintiff's first cause of action, the court concludes that plaintiff Aquilio is not entitled to rely on federal common law estoppel principles because the plan documents, consisting of the policy and the plan summary, contain a clear and unequivocal reservation of the right to terminate or amend the subject plan. In light of this finding, the court need not decide whether to adopt the interpretation/modification distinction set forth in *Kane;* but even if it did adopt the same, nevertheless, plaintiff Aquilio could not prevail because the plan documents are not ambiguous. In addition, by seeking life insurance coverage in perpetuity under the US Life policy, clearly plaintiff is seeking an extension of coverage beyond that specified in any of the governing plan documents. Thus, assuming without deciding its applicability, *Kane* is also inapposite on this basis. Finally, to paraphrase the Eleventh Circuit in *Alday,* this plaintiff's right to lifetime life insurance coverage at "any particular cost can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document." 906 F.2d at 665 (citing *Moore,* 856 F.2d at 492).[35] Unfortunately for this plaintiff, the plan's terms simply do not provide for the type of coverage he seeks in this action.

### F. Merits of Equitable and Promissory Estoppel

Even assuming *arguendo* that the court sided with plaintiff and found that this case presented appropriate circumstances warranting the application of federal common law estoppel principles, the court has serious reservations as to whether plaintiff could ultimately survive the PBA's summary judgment motion on his estoppel based cause of action. That is so because it appears that the plaintiff has not come forth with any evidence creating a genuine issue of material fact. More specifically, insofar as plaintiff's first cause of action can be read as asserting an independent claim for equitable estoppel, such claim would in all likelihood fail as a matter of law on the present record due to lack of an affirmative misrepresentation. In *Lee v. Burkhart,* previously mentioned, the Second Circuit found that the plaintiff did not sufficiently assert an equitable estoppel claim because his proposed complaint did not allege that an affirmative misrepresentation by the defendant. 991 F.2d at 1010.[36] The same is true here. Moreover, "ERISA bars only *material mis*representations." *Andre, supra,* 797 F.Supp. at 1427 (emphasis in original). Thus, as the *Andre* court convincingly explained, in language which could have been written with the present case in mind:

It [ERISA] does not impose an affirmative duty to explain benefit plans with the utmost clarity. Thus an employee's lack of care in reading corporate documents does not support the proposition that the company has misled the employee. No doubt it is possible for an employer to issue documents so garbled and ambiguous, so apt to mislead, that the employer would later be estopped from denying benefits although it had made no specific misrepresentations. But that is not this case. Salem's documents were clear enough to put Andre on notice that his enrollment in the

**35.** *See also Watkins v. Westinghouse Hanford Company,* 12 F.3d 1517, 1523 (9th Cir.1993) (citation omitted) ("Even though the correspondence turned out to be inconsistent with the Plan ultimately adopted ..., the fact that the letters were mistaken cannot on that account alone create an ERISA plan. Otherwise, every communication about prospective benefits could create a unique plan for a single participant who is not differently situated from fellow employees for whom the plan is established. Such a result would run counter to ERISA's overriding interest in avoiding side agreements that deviate from a plan applicable to all employees.")

**36.** *See also Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993) (citations omitted) ("A party asserting equitable estoppel must demonstrate that it is warranted, ..., and to avoid summary judgment on this issue must do more than show that some metaphysical doubt exits regarding the material facts.").

health plan would not occur without some further effort on his part. *Id.* Likewise in this case, the court is simply not convinced that the present record supports a finding of a material misrepresentation; nor does the record reveal a genuine issue of material fact with respect thereto.

Similarly, it appears that plaintiff has failed to show that there is a genuine issue of material fact as to his promissory estoppel claim, which the court believes is also encompassed in his first cause of action. One possible weakness which comes readily to mind is the lack of evidence even tending to support the view that plaintiff's reliance on the three PBA communications was both reasonable and foreseeable, a necessary element of any promissory estoppel claim. Indeed the evidence seems to support the exact opposite view. None of the three PBA communications relied upon by plaintiff Aquilio contains an explicit promise to provide group term life insurance at a fixed rate for the remainder of plaintiff's life. What is more, those communications speak in terms of "current" life insurance costs, and in some instances reference the US Life policy which by its terms was effective for only three years, at most. Thus, the court observes, without necessarily deciding, that even if plaintiff could surmount the high barriers to asserting a federal common law promissory estoppel claim, he could not survive the PBA's summary judgment on such claim. *See Doe v. General American Life Ins. Co.,* 815 F.Supp. 1281, 1286 (E.D.Mo.1993) (defendant insurer's motion for summary judgment granted where "the facts [did] not warrant a finding of a federal common law claim for promissory estoppel"). Further, the court observes, again without deciding, that it also seems highly unlikely, given the current state of the record, that plaintiff Aquilio has sustained an "unconscionable injury," another element of a promissory estoppel claim. *See Schwartz, supra,* 653 F.Supp. at 389 n. 1.

In short, while the court is sympathetic to plaintiff's plight, after carefully examining the applicable law, from many angles, the court is left with the firm conviction that the PBA's motion for summary judgment on plaintiff's first cause of action must be granted. In the end, the particular facts of this case do not allow the plaintiff to invoke either equitable or promissory estoppel. The subject plan is not ambiguous; the plaintiff is not seeking to interpret the plan; the record does not support a finding of conduct tantamount to fraud on the part of the PBA; plaintiff is not a victim of extraordinary circumstances; and, in all likelihood, even from a strictly factual standpoint, the record does not seem to support plaintiff's estoppel based cause of action.

## II. ERISA Disclosure Violations

In his second cause of action, apparently plaintiff is alleging that the PBA violated certain ERISA provisions pertaining to the disclosure of plan information, although he does not specify the statutory basis for any aspect of this cause of action. Plaintiff's first purported violation arises out of the fact the he did not receive the US Life plan summary advising him that the policy was cancelable. Complaint at ¶ 18. And, according to plaintiff, the fact that he did not receive that document indicates that the PBA failed to maintain an adequate and reliable mailing and notification procedure. *Id.* at ¶ 19. Evidently plaintiff believes that this alleged deficiency states an independent violation of ERISA. There is one final component to this second cause of action and that is plaintiff's assertion that, upon information and belief, the PBA violated ERISA disclosure requirements because of "the currently unfulfilled representation that the PBA would be sending out summary booklets for the new life insurance program adopted in 1990 before the end of the winter of 1990–91,...." *Id.* at ¶ 21. Plaintiff now concedes that this last allegation has become moot due to the fact that the PBA has since provided the requested documentation. *See* Plaintiff's Memorandum at 14. Consequently, in light of that concession, the court will not bother to address this portion of the second cause of action.

As to the remaining aspects of this cause of action, the PBA contends that such cause of action is barred as a matter of law because plaintiff did not exhaust his administrative remedies. More specifically, prior to com-

mencing this lawsuit, he did not submit a written demand for the documents he is seeking herein. The PBA further contends that plaintiff's attempt to satisfy the statutory written demand requirement by a letter from his attorney submitted after the commencement of this action is not sufficient because without a **pre**-action demand letter this action was prematurely filed. The PBA thus declares that this action does not present "a 'ripe' case or controversy." PBA Memorandum at 23. In rejoinder the plaintiff states that the PBA misconstrues the nature of this cause of action, and thus the statutory notification argument is wholly inapplicable. Plaintiff then cross moves for summary judgment, contending that as a matter of law the PBA violated ERISA disclosure provisions with respect to the 1985 letter from PBA Treasurer Fairchild[37] because the PBA did not prepare and distribute a plan summary in conjunction therewith within the required time frame. A central premise of this argument is that that 1985 letter amounted to a misleading plan summary, and thus plaintiff is not limited to "[t]he contradictory terms of the policy the PBA now offers, .... Plaintiff's Memorandum of Law at 15. At a minimum, even if the court does not grant summary judgment in plaintiff's favor on his cross-motion, he believes that he has created a fact issue as to the methods employed by the PBA to distribute the 1987 US Life plan summary; and thus the PBA's motion for summary judgment on this second cause of action must be denied.

Before considering the relative merits of these positions, a brief summary of the facts relevant to this particular cause of action is in order. The affidavits of PBA President Canfield, Treasurer Fairchild, and Office Manager Erhardt outline in quite some detail the PBA's office practices with respect to mass mailings, particularly those pertaining to insurance matters. *See, e.g.,* Erhardt Affidavit at ¶¶ 11–21. A few aspects of that procedure are worth noting. First, "[s]ince approximately 1980, all mailing sent to participants at the PBA plan have [sic] been computerized." *Id.* at ¶ 11. The names and addresses of plan participants, along with other insurance-related information is entered into the computer through normal data entry, and reviewed for accuracy several times a year. *Id.* at ¶ 13. If a PBA document is returned as non-deliverable due to an incorrect address, the PBA then tries to contact the member to ascertain the new address. *Id.* at ¶ 14. If the PBA is unsuccessful in that regard, the document is re-mailed with directions to forward. *Id.* Efforts are then made to ascertain the participant's new address through other means. *Id.*

As to plaintiff Aquilio, the PBA's records indicate that his correct address has been in the computer since at least 1980. *Id.* at ¶ 15. Interestingly, in approximately November, 1990, plaintiff went to the PBA office claiming that he had not received certain correspondence. *Id.* at ¶ 16. In plaintiff's presence, Office Manager Erhardt generated a mailing list which accurately reflected plaintiff's name and address. *Id.* With respect to the 1987 US Life plan summary in particular, Ms. Erhardt explicitly avers that she "personally oversaw" their mailing "to *all* plan participants and was subsequently made aware, through questions from numerous plan participants regarding these summaries, that these summaries were, in fact, mailed and received by plan participants." *Id.* at ¶ 26 (emphasis in original).

For his part, even though he claims not to have received the US Life plan summary, plaintiff does not allege in his complaint that he ever requested the same from the PBA. Likewise, there are no allegations in the complaint that the plaintiff ever requested in writing from the PBA a plan summary for the insurance program adopted in 1990. After the commencement of this lawsuit, however, plaintiff's attorney did request certain documentation from the PBA in a letter dated November 18, 1991; and within thirty days of the receipt of that letter, the requested information was provided.[38] PBA's Memorandum of Law at 22 n. 8.

---

37. Complaint, exh. A thereto.

38. The court has no reason to doubt the veracity of this statement, especially because plaintiff has

The general duty to disclose under ERISA is found in section 1021 of that statute. Section 1024(b)(4) provides though that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

29 U.S.C. § 1024(b)(4) (West 1985). ERISA's Civil Enforcement provision provides that failure to comply with that statute may, in the court's discretion, result in the plan administrator being liable to the participant "in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1)(B) (West Supp.1994).

■ Insofar as plaintiff's second cause of action can be read as claiming that the PBA is liable for failure to provide certain information as dictated by ERISA, such as a plan summary, the court agrees with the PBA that plaintiff's failure to make the requisite written demand under 29 U.S.C. § 1024(b)(4) bars this cause of action. *See Rinard v. Eastern Co.,* 769 F.Supp. 1416, 1429 (S.D.Ohio 1991), *rev'd on other grounds,* 978 F.2d 265 (6th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993) (citation omitted) ("Plaintiffs have not stated a claim against Eastern under § 1132(c), since that section requires that a request for information be made to the administrator to which the administrator refuses a reply."); *First Atlantic Leasing Corp. v. Tracey,* 738 F.Supp. 863, 875–876 (D.N.J.1990) (claim based upon 29 U.S.C. § 1024(b)(4) barred by party's failure to make a request to the plan administrator and wait thirty days before commencing the suit).

Furthermore, plaintiff cannot overcome this procedural hurdle by relying on the demand letter from his attorney, sent after the commencement of this lawsuit. A similar attempt to circumvent the written request requirement of section 1024(b)(4) was rejected by the court in *First Atlantic.* There the court reasoned that the plaintiff "should not be permitted to commence suit *before* his cause of action has even accrued." 738 F.Supp. at 876 (emphasis in original) (citation omitted). The court further reasoned that it lacked jurisdiction over a claim for failure to provide ERISA information "because the suit was filed prematurely and thus, there was not 'ripe' case or controversy." *Id.* (citation omitted). Thus plaintiff cannot rely upon his attorney's belated demand letter to satisfy the condition precedent for bringing a suit under 29 U.S.C. § 1024(b)(4).

■ Based strictly upon the allegations in the complaint, the foregoing should completely dispose of plaintiff's second cause of action. However, in response to the PBA' summary judgment motion, for the first time, plaintiff alleges that the 1985 letter from PBA Treasurer Fairchild constitutes a misleading SPD, which the court should treat as a plan document. As he did in his first cause of action, apparently plaintiff is once again relying upon 29 U.S.C. § 1132(a)(1)(B) as the statutory basis for this claim. Assuming for the moment, (1) plaintiff's complaint can even be read as alleging a claim based upon a misleading plan summary, and (2) that such a claim is properly brought under this statute,[39] the court concludes that on the present record the 1985 PBA letter from Treasurer Fairchild did not amount to a plan summary.

ERISA contains an explicit provision governing plan descriptions and SPDs. *See* 29 U.S.C. § 1022. Regardless of whether plaintiff characterizes the 1985 letter as a SPD or a plan description,[40] when that letter is compared to section 1022, which comprehensively lists what must be contained in such documents, there is no doubt that it cannot qualify as either. The court will not list each element of section 1022 which is missing

---

admitted receiving this material. It would have been preferable, however, for these facts to have been set forth in a supporting affidavit.

**39.** The court has serious reservations as to both these assumptions.

**40.** Plaintiff's memorandum of law is not clear on this point; nor does his complaint provide any insight.

from the 1985 letter, but, to illustrate, it will note a few relatively significant omissions. First of all that letter does not specify "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits[.]" 29 U.S.C. § 1022(b) (West 1985). Also absent from the 1985 letter "[t]he procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part[.]" *Id.* In light of the foregoing, the court finds that plaintiff's cross-motion for summary judgment on his second cause of action must be denied in its entirety; and conversely that the PBA's motion for summary judgment on this cause of action must be granted.

### III. *Attorney's Fees and Expenses*

Based upon the foregoing, at this point, it should be painfully clear to the plaintiff that the court will not entertain that part of his motion seeking attorney's fees and costs under 29 U.S.C. § 1132(g)(1). Plaintiff's request for the same is in all respects denied.

Accordingly, for the reasons set forth herein, the motion for summary judgment pursuant to Fed.R.Civ.P. 56 by the defendant, Police Benevolent Association of The New York State Troopers, Inc., is hereby GRANTED in its entirety. The cross-motion for partial summary judgment by the plaintiff, Dominick J. Aquilio, as to the second cause of action is DENIED. That part of plaintiff's cross-motion seeking statutory attorney's fees and costs is also DENIED.

The Clerk is directed to enter judgment in accordance with the above.

IT IS SO ORDERED.